| | |
|---|---|
| **Federal Defenders** <br> OF NEW YORK, INC. | Eastern District <br> One Pierrepont Plaza, 16th Floor <br> Brooklyn, NY 11201 <br> Tel: (718) 330-1200 Fax: (718) 855-0760 |
| Tamara L. Giwa <br> *Executive Director* | Michelle A. Gelernt <br> *Attorney-in-Charge* |

August 13, 2025

**By ECF**
The Hon. Rachel P. Kovner
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:  **United States v. Ashraf Omar Eldarir**
           **20 Cr. 243 (RPK)**

Dear Judge Kovner:

  Ashraf Omar Eldarir is a 52-year-old first offender and the sole provider for his wife and their three young children. He stands convicted by guilty plea of importing Egyptian artifacts into the United States without declaring them on customs forms, an offense that carries an advisory Guidelines range of 15 to 21 months. As a result of this arrest nearly five and a half years ago, Egyptian authorities banned Mr. Eldarir's wife and children – in Egypt at the time – from traveling to the U.S., thereby separating him from his family for nearly four years and causing him to fall into a major depression that required mental health treatment. In light of Mr. Eldarir's exemplary life before and since the instant offense, the extraordinary punishment he has already received, and the harm and destruction that another separation from him would cause to his extremely vulnerable family, we submit that a sentence of incarceration in this case would be greater than necessary. Instead, as the law expressly provides for, a non-carceral sentence of supervised release or probation would be sufficient to comply with the purposes of sentencing.

**Charges and Offense Conduct**

  On February 10, 2025, Mr. Eldarir pled guilty before Your Honor to a second superseding indictment (filed January 31, 2025) that charged him with four counts of importing and bringing into the United States merchandise contrary to law, in violation of 18 U.S.C. §§ 542 and 545. Specifically, Mr. Eldarir brought Egyptian artifacts on flights from Cairo, Egypt to the JFK Airport without declaring them on customs forms, contrary to 18 U.S.C. § 542, which prohibits, as relevant here, introducing merchandise into United States commerce by means of false statements in declarations. *See* Presentence Investigation Report (PSR) ¶¶ 1-4; ECF No. 117, Second Superseding Indictment.[1] The flights occurred in April, July and November 2019

---

[1] The previous superseding indictment, filed June 11, 2024, charged the same four counts but didn't state what law had been contravened. The defense moved to dismiss that superseding indictment on that ground, and in response to the motion the government brought the instant

and January 2020. On each of the 2019 flights Mr. Eldarir brought a single artifact in his luggage; on the 2020 flight he brought approximately 590 artifacts in three checked-in suitcases. *See* ECF No. 117; PSR ¶¶ 2 - 5. His false statements consisted essentially of failing to declare the merchandise or to include its value in customs forms.

The artifacts Mr. Eldarir brought on the January 2020 flight were discovered by Customs and Border Protection (CBP) officers, who stopped Mr. Eldarir at the direction of Homeland Security Investigations (HSI). HSI seized the artifacts and Mr. Eldarir's cell phone and detained him for questioning before releasing him. They arrested him about a month later, on February 28, 2020, on a complaint and arrest warrant for bringing the artifacts into the United States contrary to law in violation of 18 U.S.C.§ 545.[2] based on the smuggling of the artifacts seized from his luggage. *See* ECF No. 1. On July 2, 2020, the government filed an indictment charging Mr. Eldarir with one count of importing and bringing into the United States merchandise contrary to law, in violation of 18 U.S.C. § 545, based on the January 2020 incident. *See* ECF No. 9. The indictment was assigned to Judge DeArcy Hall.

**Procedural History**

On July 10, 2020, the defense filed a motion to inspect the Grand Jury records to assess a potential challenge to the grand jury selection procedure based on the grand jury sitting in Central Islip as opposed to Brooklyn, at a time when most members of the public in the Eastern District of New York were still under a stay-at-home order due to the Covid-19 pandemic. *See* ECF No. 10. The government began producing Rule 16 discovery in August 2020, and in the meantime litigation regarding the Grand Jury issue continued up until January 2021, at which time a schedule was set for pretrial motions. *See* ECF Nos. 11 – 32.

On February 23, 2021, the defense filed a motion to suppress evidence obtained from Mr. Eldarir's cell phone. *See* ECF No. 35. After extensive briefing on that motion, an evidentiary hearing was held on November 3, 2021. *See* ECF No. 36 – 55; 11/3/2021 Minute Entry and Order. Although post-hearing briefing was concluded the following month, the Court didn't decide the motion until June 6, 2023, announcing on that date that it was denying the motion and following with a written decision on July 6, 2023. *See* ECF Nos. 58, 72, 76; 6/6/2023 Order.

On August 1, 2023, the Court set a trial date of April 7, 2025. In December 2023, the government notified the Court and the defendant that it would be filing a superseding indictment charging additional counts of smuggling. *See* 12/7/2023 Docket Entry. The Court set schedules for pretrial and trial motions in March 2024, but the government did not file the superseding indictment until June 12, 2024. *See* ECF No. 79. This was the previously referenced first superseding indictment that brought the three additional counts of smuggling in 2019.

---

superseding indictment which stated that the law being contravened was 18 U.S.C. § 1542. *See* ECF Nos. 113, 114, 116, 117.

[2] In explaining what laws had been contravened by the importation of the artifacts, the complaint identified a number of statutes and regulations, but not 18 U.S.C. § 542. *See* ECF No. 1 ¶¶ 3 – 6.

On September 26, 2024, the Court advanced the trial to January 27, 2025. On January 21, 2025, the case was reassigned to Your Honor. On January 25, 2025, the defense filed a motion to dismiss the superseding indictment. On January 26 the government requested a short adjournment to supersede. Jury selection was adjourned to February 10, with trial to commence February 18.  The second superseding indictment was filed January 31.  Mr. Eldarir plead guilty to this indictment on February 10.

**A Sufficient Sentence Under Section 3553(a)(2)**

The "overarching' statutory directive to sentencing courts is the so-called "parsimony command," instructing district courts to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing...." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). To fulfill that mandate, the sentencing court must first "'consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue,'" and then impose the lowest sentence sufficient to achieve those sentencing goals. *Gall v. United States*,552 356, U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

The purposes of sentencing include providing just punishment for the offense, affording adequate deterrence to criminal conduct, protecting the public from further crimes of the defendant, and providing the defendant with the necessary training, care and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In determining the sentence to be imposed, the Court must consider, among other things, the nature and circumstances of the offense, the history and characteristics of the offender, the sentencing range established in the advisory Sentencing Guidelines, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

**The Guidelines Range is 15 to 21 Months, and the Court Should Use a Guidelines Range of 12 to 18 Months**

In calculating its Guidelines custody range of 21 to 27 months, the PSR includes a 2-level increase under U.S.S.G. § 2B1.5(b)(5), which applies if the offense involved a pattern of misconduct involving cultural heritage resources or paleontological resources. *See* PSR ¶ 35. A "pattern of misconduct" for purposes of subsection (b)(5) "*means two or more separate instances of offense conduct* involving a resource that did not occur during the course of the offense." USSG § 2B1.5, comment (n.6(A)) (emphasis added).

In support of this increase, the PSR states that the "instant investigation revealed the defendant also smuggled artifacts other than the artifacts charged in the Indictment. For example, on September 20, 2018, the defendant travelled from JFK Airport to Cairo Egypt, and returned to JFK Airport on December 4, 2018, aboard Egypt Air Flight MS985 with smuggled artifacts. He did not make any customs declarations when he arrived in the United States." PSR ¶ 24. Thus, the PSR identifies only one separate instance of offense conduct (smuggling merchandise into

3

the U.S. contrary to law), on December 4, 2018.  Under the Guidelines definition cited above, this single separate instance of smuggling does not suffice to trigger the two-level increase under § 2(b)(5), which requires instead that there be two or more separate instances of the offense conduct. Without the incorrectly included enhancement, the adjusted offense level is 18  and the total offense level is 14, which corresponds to a Guideline custody range of 15 – 21 months.

This calculation is premised on Mr. Eldarir not receiving the additional one-level decrease for *timely* acceptance of responsibility that applies if he timely notifies "authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently[.]" U.S.S.G. § 3E1.1(b). Although the decrease for timely acceptance is not warranted here under the text of the Guidelines, under the circumstances that bore on Mr. Eldarir's decision here, he should not be in a worse position for not having entered the plea earlier.

Undersigned counsel advised Mr. Eldarir not to enter a plea to the initial indictment or the one that superseded it because counsel was of the view that those indictments were fatally defective in this case unless premised on a "contrary to law" violation of 18 U.S.C. § 542. Based on the statutes and regulations cited in the complaint and in subsequently disclosed search warrants, which did not include § 542, counsel suspected that the indictments were defective and susceptible to sound arguments for acquittal by the jury or by the trial court on a Rule 29 motion. With this in mind, counsel asked the government, orally and in writing, to identify the statute Mr. Eldarir's importation contravened. But this was to no avail, and the first point at which the government mentioned § 542 was in its charge requests, well after trial preparation was underway. Suspecting that no such theory had been presented to the Grand Jury, counsel filed the pretrial motion to dismiss.  Soon after the government changed course and filed the second superseding indictment on January 31st – and before the jury was selected or even empaneled – counsel advised Mr. Eldarir to enter a guilty plea, and he followed counsel's advice.

The Guidelines recognize that "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial" where, for example, [he] goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* [] to make [] a challenge to the applicability of a statute to his conduct"). USSG § 3E1.1, comment (n.2). In this case Mr. Eldarir planned to go to trial to make a challenge to the applicability of 18 U.S.C. § 545 to his case as charged in the first two indictments. Mr. Eldarir decided to forego that constitutional right upon being advised by counsel that the challenge was no longer viable in light of the second superseding indictment. And he did so prior to jury selection, thereby sparing the system's resources to the extent he could while maintaining his potential legal challenge. His advisory Guidelines range, were his acceptance of responsibility to be treated as timely, would be 12 to 18 months. The Court should use that Guidelines range to avoid unfairly punishing Mr. Eldarir for following counsel's advice not to forego a sound legal challenge by pleading guilty to a possibly defective indictment.

### The History and Characteristics of Ashraf Eldarir

In considering the appropriate sentence to impose, among the first factors the Court is instructed to consider are "the history and characteristics of the defendant." 18 U.S.C. §

3553(a)(1). "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a)." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Ashraf Eldarir has led a decent and admirable life marked by his commitment to his family and friends and his generosity to his community. A 52-year-old naturalized U.S. citizen, he has studied or worked his entire life. He earned a degree in medicine and surgery from Alexandria University in 2001.[3] He immigrated to the United States the next year with dreams of practicing medicine here. His plans were derailed when his then wife, Beatrice Eldarir, suffered a life-threatening medical emergency which required sustained care. Mr. Eldarir became her primary caregiver, as there was no one else available to help, and he used up all his savings and had to find work. *See* PSR ¶ 77. Since that time, Mr. Eldarir supported himself and his family by getting a TLC license and working as a driver for a car service. *See id.* ¶¶ 78, 80 – 82.

Beatrice writes of this:

> Ashraf's unwavering support during challenging times, particularly my serious medical issues, left an indelible mark on me. His dedication went beyond the ordinary; he tirelessly pursued diagnoses for my undiagnosed illnesses, even advocating for me with doctors who initially offered no solutions. [] During my recovery, which spanned a year, Ashraf forewent his own aspirations to become a licensed physician in the USA, instead working double shifts to support us.

Ex. A, Letter from Beatrice Eldarir.

Mr. Eldarir has taken care of others in his family, as well. His four sisters report, in a joint letter to the Court, that Mr. Eldarir, their eldest brother, is "like a second father to us," "a role model for us since we were young," and "also our protector throughout our childhood. With our father working most of the time, it was Ashraf who helped us with our studies and guided us toward good morals. He paid for all of their university fees and wedding expenses. Ex. A, Letter from Nadia, Noura, Suhair, and Faten Omar-Al-Darir. *See Id.*, Letter of Heba Elsawy ("Ashraf is the eldest son in his family. He took it upon himself to care for his parents before their deaths, and to also take care of his siblings.").

Now the actual head of his household of his wife Heba and their three children – ages 10, 10 and 8 – Mr. Eldarir is fully committed to, and responsible for, their welfare. As his wife related to the Probation Department, Mr. Eldarir "handles all responsibilities, including school matters, finances, and medical appointments, due to her limited English and lack of support in the United States. She emphasized that their children are very attached to [Mr. Eldarir] and that his absence would be a major shock[.]" PSR ¶¶ 58, 61.

But Mr. Eldarir's compassion and generosity is not limited to his family. They note that it extends to strangers as well. His sisters say "Ashraf would help anyone, whether a stranger or

---

[3] We have obtained copies of Mr. Eldarir's graduation certificate and his medical license and are in the process of having them translated from Arabic to English.

5

relative, and never hesitated to offer support. For example, we recently found out – purely by chance – that he had supported an entire low-income family (a father, mother, and three children) for twenty years without telling anyone. We only learned about it recently from the parents of that family." Ex. A.  And every year during the holy month of Ramadan, he would feed thousands of people and "give money to the poor to help them by." *Id.*

Mr. Eldarir's ex-wife echoes this observation: "His compassion extended beyond his family; he cared for my dying brother, Alfred, visiting him three times a week at Staten Island Memorial Hospital until his passing. He also supported my brother's daughter and her children, all of whom held him in high regard." *Id.* "Ashraf's commitment to his community," Beatrice adds, "was equally remarkable. His actions on September 11, 2001, when he rescued five stranger[s] from the World Trade Center, driving them to safety, is a testament to his courage and selflessness." *Id.*

These commendable characteristics and extraordinary acts warrant mercy from the Court at sentencing. *See Rita v. United States*, 551 U.S. 338, 365 (2007) (Stevens, J., concurring) (recognizing that public service goes unaccounted for under the Guidelines arithmetic, but may be considered by a sentencing judge under section 3553(a)); *see, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

## **Mr. Eldarir and His Family's Extremely Difficult Personal Circumstances Warrant a Downward Departure or Variance**

U.S.S.G. § 5K2.0(a)(4) broadly permits a departure where there are characteristics of the defendant or other circumstances that are not adequately captured by the applicable Guidelines range. While in the pre-*Booker* sentencing regime, the Guidelines disfavored departures based on family circumstances except in "extraordinary circumstances," *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003), even under this mandatory regime, the Second Circuit affirmed a number of downward departures that the trial court found had met this stringent threshold:

> We have found family circumstances to be extraordinary, and hence a permissible basis for departure, where the defendant provided substantial support for two children, his wife spoke limited English and had a limited earning capacity, and his elderly parents were likely to require both physical and financial assistance in the near future, *see United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997); where the defendant was the sole support of several young children, one of whom was an infant*, see United States v. Johnson*, 964 F.2d 124, 129–30 (2d Cir. 1992); and where the defendant supported his wife, two children, his paternal grandmother, and his disabled father who depended also on the defendant's physical strength to help him get in and out of his wheelchair, *see United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991).

*United States v. Cutler*, 520 F.3d 136, 164 (2d Cir. 2008).

Mr. Eldarir's uniquely challenging family circumstances fall squarely within the bounds of what the Circuit has recognized as meriting a downward departure. As described above, in the PSR, and in the letters of support, his vulnerable family would be left adrift without him. If Mr. Eldarir were incarcerated, "his wife would be unable to care for their children on her own. She has never been employed, speaks limited English, and would not be able to manage the household financially. Additionally, there are no other family members available to help. At present, the defendant is solely responsible for communicating with their children's schools and doctors due to his wife's language barriers." PSR ¶ 60.

Left without their father, Mr. Eldarir's sons would be particularly susceptible to profound and lasting harm. During the nearly four years they were unable to see him due to the travel ban that was imposed on the family, they "suffered psychological problems due to their separation from their father." Ex. A, Letter from Heba Elsawy. The youngest son would be even more at risk, as he was recently diagnosed with muscular dystrophy and hence needs physical therapy three times a week. *See id.*; PSR ¶ 59.

Such collective punishment would be unwarranted and disproportionate, and the PSR, in recommending a below-Guidelines sentence in this case, rightly identifies it as a factor warranting a downward departure or variance. *Id.* ¶ 103. The profound family circumstances at play here are something the Court can and should take into account at sentencing. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *See, e.g.*, *United States v. Weisberg*, 07 Cr. 66 (HBS), 2010 WL 3944964, at *10 (W.D.N.Y. 2010)

**A Carceral Sentence Would be Greater than Necessary to Comply with the Purposes of Sentencing**

Sending this 52-year-old first offender to prison would not advance the goals of sentencing. As his conduct before and since the offense has been exemplary – including five and a half years and counting on pretrial supervision during which he has had perfect compliance – incarcerating him would do nothing to further the purpose of providing him with necessary corrective assistance.

And there is no serious argument that incarcerating Mr. Eldarir is necessary to protect the public from further crimes. Based on any metric that could conceivably be used – age, lack of prior arrests, conduct on pretrial supervision, nature of the offense, incentives – Mr. Eldarir presents no risk of recidivism. *See, e.g.,* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, at 26 (2021);[4] U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6–7 (March 2017).[5]

The only remaining considerations – in this case, the only remotely plausible reasons to incarcerate Mr. Eldarir -- are to satisfy the need for punishment and general deterrence. On

---

[4] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

[5] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf

neither score is it necessary to send this man to prison. Because they largely overlap here, I will discuss them together. First and foremost, Mr. Eldarir has already been punished in a manner and to a degree that matches, or even exceeds, being sent to prison: By virtue of this prosecution, he he was involuntarily separated from his wife and children for three years and eight months, the length of time they were confined to Egypt and banned from traveling to the U.S. because of Mr. Eldarir's charges. *See* PSR ¶ 70; Ex A, Letter from Heba Elsawy. At the time of Mr. Eldarir's arrest five and a half years ago, his twin sons were 5 years old and his younger son was 2. By the time he saw them again, after Egypt finally lifted the ban and permitted them to travel, the twins were 9 and the younger son was 6. Hence, Mr. Eldarir missed huge chunks of their early childhood years entirely because of this case, which not only prevented him from traveling to Egypt but them from traveling to the U.S. Even being incarcerated doesn't typically prevent a person from seeing his family, since they can still visit him in prison. But this two-way travel ban separated this man from his wife and children even more than being in prison would have, and for approximately twice as long as the prison sentence prescribed by the Guidelines. This, by itself, is punishment enough, and especially for a devoted father and husband like Ashraf Eldarir.

The separation "had a profound impact on" Mr. Eldarir. *Id*; *see* Ex. A, Letter from Mr. Eldarir's sisters ("Ashraf went through immense hardship after his arrest in connection with this case. The Egyptian government confiscated all his assets, and his American-born children were barred from traveling to be with him in their own country, the United States."). Owing to the "anxiety and emotional distress he experienced," Mr. Eldarir sought and received therapy at the Long Island Consultation Center, a community mental health care clinic in East Elmhurst, New York. He was diagnosed with "major depressive disorder." *Id.* ¶¶ 70 – 73. His ex-wife, Beatrice, also noticed "signs of his depression particularly during his separation from his family, a period when he was clearly not in a good place emotionally." *Id.* ¶ 74.

Additionally, Mr. Eldarir lost his mother during this time – she suffered a stroke and died a month later in July 2020, and he was likewise unable to see her due to his pretrial travel restrictions. *Id.* ¶ 50. According to his family, this deeply affected Mr. Eldarir. His sisters recount, "What hurt the most was when our mother suffered a stroke upon hearing the news of his arrest and passed away just a month later. Ashraf had always been the one who took care of her, but because of the case, he was unable to be there for her – and he couldn't even attend her funeral." Ex. A.

Mr. Eldarir also lost a significant amount of his money and property, as the Egyptian authorities seized all of his assets in Egypt following his arrest, including funds from his bank account and any property registered in his name. PSR ¶ 70; Ex. A, Letter from Eldarir's sisters; *id.*, Letter from Heba Elsawy ("they kept our money and possessions.").

Finally, the Court should take into account, in measuring the amount of punishment Mr. Eldarir has endured, that he has had this case hanging over him, and been subjected to the restrictions of Pretrial supervision, for five and a half years. This is an exceptionally long time to be under both of those things, and was due to circumstances completely outside of Mr. Eldarir's control. Those include delays caused by the Covid-19 pandemic, the unusually long delay in resolution of the motion to suppress, the previously assigned judge's trial schedule, and the superseding indictment. Whether intended or not, this, too, is punishment. For a proud and

sensitive man like Mr. Eldarir, so, too, is the stigma of a felony conviction, as well as the collateral consequences that come with it. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving district court's finding that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant" (quotations omitted)); *United States v. Schulman*, 16 Cr. 442 (JMA) (E.D.N.Y. Oct. 6, 2017), Doc. 155 at 39:4–11 (finding that reputational ruin and end of the defendant's professional career was "substantial and meaningful punishment," particularly where the defendant's "emotional well-being has suffered as a result"); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing non-custodial sentence and urging courts to consider the collateral consequences of felony convictions when imposing sentence).

      Mr. Eldarir has been through the ringer. From the date of his arrest some five and a half years ago, he has suffered immensely. He has learned from his mistakes and righted himself, and presents no risk of recidivism. A sentence sufficient but not greater than necessary would be time served followed by supervised release, or probation. If the Court feels that an additional punitive measure is required, we would ask that it consider home detention or community confinement so that Mr. Eldarir could continue to work and provide for his family.

                                            Respectfully submitted,

                                            /s/

                                            Kannan Sundaram
                                            Jullian Harris-Calvin
                                            Assistant Federal Defenders
                                            (718) 330-1203
                                            *Counsel for Mr. Eldarir*

cc:     Nomi D. Berenson
         William P. Campos
         Assistant U.S. Attorneys