

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EDP:WPC/NDB
F. #2020R00093

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 20, 2025

By ECF

Honorable Rachel P. Kovner
United Stated District Judge
Eastern District of New York.
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Ashraf Omar Eldarir
                Criminal Docket No. 20-243 (S-2) (RPK)

Dear Judge Kovner:

      The government respectfully submits this letter in advance of sentencing in the above-referenced case, which is scheduled for August 27, 2025, at 4:30 p.m.  On February 10, 2025, in the morning before jury selection, the defendant Ashraf Omar Eldarir pleaded guilty, without a written plea agreement, to each of the four counts in the second superseding indictment charging a separate event of smuggling Egyptian antiquities into the United States.  For the reasons set forth below, the government recommends that the Court impose an above-Guidelines sentence of 36 months' imprisonment.

I.      <u>Procedural Background</u>

      On February 28, 2020, Eldarir was charged by complaint with smuggling 590 ancient Egyptian artifacts into the United States through JFK International Airport ("JFK") on January 22, 2020, in violation of 18 U.S.C. § 545.

      On July 2, 2020, a grand jury returned an indictment that charged Eldarir with two counts of smuggling in violation of 18 U.S.C. § 545: one count for the January 22, 2020 massive smuggling event, and the other count for an earlier smuggling event.  On June 11, 2024, the grand jury returned a four-count superseding indictment that charged the defendant with two additional counts of earlier smuggling events (the "S-1 Indictment").  On January 31, 2025, the grand jury returned a four-count second superseding indictment that defendant was charged in a second superseding indictment (the "S-2 Indictment") which corrected certain charging language in the S-1 Indictment.

        Trial was scheduled to start on February 10, 2025.  Shortly before jury selection began, the defendant pleaded guilty to all four smuggling counts of the S-2 Indictment.  There is no plea agreement.

II.       <u>The Offense Conduct</u>

        Defendant Omar Ashraf Eldarir, a licensed physician in Egypt, decided it was more financially lucrative for him to steal Egyptian artifacts and smuggle them into the United States to sell than to use his medical degree and treat patients in Egypt.  The defendant, therefore, made a conscious, deliberate choice to operate a theft and smuggling scheme.

        The defendant obtained Egyptian artifacts and antiquities, which belonged to Egypt itself.  The defendant then snuck them into the United States.  He put them in his checked luggage and did not make any customs declarations.   Once in the United States, the defendant consigned the artifacts to arts dealers to sell at auction with provenances the defendant fabricated.

        The defendant communicated with individuals in Egypt who had access to illicit dig sites, some of whom were likely looters and grave robbers.  Those individuals provided the defendant with videos and photographs of artifacts available for sale.  The defendant arranged with the individuals to obtain the artifacts he wanted.  The defendant flew to Egypt, obtained the artifacts, and returned to New York to then place them for auction at, for example, Palmyra Heritage, Arte Primitivo, and Christie's.  The defendant provided the auction houses with provenances that falsely claimed the artifacts were from his grandfather's collection which was brought to the United States before 1948 because, had that been true, it would mean that the artifacts' exported from Egypt and into the United States was not prohibited.

    A.       <u>The Charged Conduct</u>



1.    <u>Count One</u>

On April 18, 2019, the defendant flew to JFK Airport from Cairo, Egypt aboard Egypt Air Flight MS985.  In his luggage, the defendant concealed an ancient Egyptian polychrome artifact (described in Count One of the S-2 Indictment as the polychrome relief and depicted here as Government Exhibit 201).  Upon arriving in the United States, the defendant did not declare the artifact when passing through U.S. Customs.  The defendant later discovered that the artifact had broken in transit.  He communicated by WhatsApp text with an individual in Egypt identified in his phone as "Major Hassan,"

whom he told about the broken Egyptian antiquity. The defendant later contacted an art dealer in New York City ("Art Dealer-1"), who assisted the defendant in finding a restorer to fix the break in the artifact. On November 24, 2019, the defendant placed the artifact up for auction through Palmyra Heritage Gallery ("Art Dealer-2") (collectively, the "Art Dealers"). The artifact sold at auction for approximately $3,810 to an unwitting buyer ("Buyer-1"). See PSR ¶ 16. The artifact was later seized by law enforcement agents and Art Dealer-2 returned the funds to Buyer-1.



2. Count Two

On May 21, 2019, the defendant flew to JFK from Cairo aboard Egypt Air Flight MS985. In his luggage, the defendant concealed an ancient Roman limestone stele (as described in Count Two of the S-2 Indictment and depicted here as Government Exhibit 202). Upon arriving in the United States, the defendant again did not declare the artifact when passing through U.S. Customs. On September 15, 2019, the defendant placed the ancient artifact up for auction through Art Dealer-2. The artifact sold at auction for $1,000 to another unwitting buyer ("Buyer-2"). See PSR ¶ 18. The artifact was later seized by agents.



3. Count Three

On November 6, 2019, the defendant flew to JFK from Cairo aboard Egypt Air Flight MS985. In his luggage, the defendant concealed an ancient Roman limestone head (described in Count Three of the S-2 Indictment as an Egyptian limestone Roman head of a man and depicted here as Government Exhibit 203). Upon arriving in the United States, the defendant again did not declare the artifact when passing through U.S. Customs. In November 2019, the defendant consigned the ancient artifact to Art Dealer-2 for sale. On November 24, 2019, the artifact sold at auction for $1,200 to Buyer-3. See PSR ¶ 17. The artifact was later seized by law enforcement agents and Art Dealer-2 returned the funds to Buyer-3.

3

4. <u>Count Four</u>



On January 22, 2020, the defendant flew to JFK from Cairo aboard Egypt Air Flight MS985. In his three large, checked suitcases, the defendant concealed 590 ancient Egyptian artifacts (as described in Count Four of the S-2 Indictment and depicted above as Government Exhibit 204). Upon arriving in the United States, the defendant again did not declare the artifacts when passing through U.S. Customs. The defendant was then stopped at JFK by U.S. Customs and Border Protection ("CBP") Officers and Department of Homeland Security, Homeland Security Investigations ("HSI") New York Special Agents. The appraised value of these rare and funerary artifacts was $82,000. <u>See</u> PSR ¶ 19.

In addition to recovering nearly 600 ancient artifacts from the defendant's luggage that day—a seizure that constitutes JFK's largest seizure of smuggled antiquities to date—agents also discovered multiple documents, including what appeared to be decades-old Egyptian blank pages with watermarks, decades-old Egyptian loose stamps, and multiple black-and-white old-looking photographs purporting to depict an ancestor of the defendant displaying several of the artifacts in his office from long ago. The defendant claimed this material to be legitimate provenances for the detained and later-seized artifacts which purported to document that the artifacts were removed from Egypt decades ago (when doing so could have been legal), contrary to the obvious fact that the defendant took the artifacts out of Egypt that very day.

Upon further examination, HSI forensic examiners determined that the documents were forgeries and the photographs had been photoshopped and aged. In short, these decades-old Egyptian blank pages and stamps, the fraudulent provenances and photoshopped images were part of the defendant's provenance forgery toolkit. See PSR ¶ 20.

In 2024, agents interviewed the Art Dealers, both of whom were shown copies of the fraudulent provenance the defendant had in his possession during the JFK interdiction. Each of the Art Dealers separately also provided agents photocopies from their files of the provenances that the defendant had previously provided to them with his past consignments. Each of the Art Dealers separately confirmed that some of the artifacts the defendant had previously consigned to them were on the purported provenance papers in the defendant's possession at the time of the JFK stop, and that the defendant would not allow either to keep the original provenance, only photocopies. Additionally, the Art Dealers subsequently confirmed that the defendant is the only consignee either one had encountered in their decades selling antiquities who provided a photocopy but not an original provenance. That, too, was part of the defendant's fraudulent scheme—the defendant ensured the purported original provenance could not be closely analyzed, inspected, or questioned, thereby making it easier to pass of the artifacts as legitimately exported from Egypt and imported into the United States. All this was to smooth the way for the defendant's sale—his monetization— of the smuggled antiquities.

B.  Uncharged Conduct



The defendant also smuggled artifacts other than the artifacts charged in the S-2 Indictment. Evidence from the defendant's cell phone, searched pursuant to warrant, subsequently allowed agents to track down and confirm yet additional artifacts that the defendant smuggled and sold. Agents identified in the defendant's phone geotagged, dated

5

photographs of artifacts in Egypt that corresponded to the defendant's known travel to and presence in Egypt, and which artifacts the defendant later consigned to art dealers in New York, the timing of which again corresponded to the defendant's known travel to and presence in New York.  Some of those additional smuggled artifacts are depicted above as Government Exhibits 205, 206, and 207.  Agents were then able to trace and locate the buyers and recover these smuggled artifacts for repatriation to Egypt. See PSR ¶ 25.

For example, on September 20, 2018, the defendant travelled from JFK to Cairo, and returned to JFK on December 4, 2018, aboard Egypt Air Flight MS985.  He did not make any customs declarations when he arrived in the United States.

The defendant's phone contained photographs of a female sarcophagus lid, a mask with a beard, and another mask – as depicted above.  The metadata of the photographs show that they were taken in Egypt on October 8, 2018, when the defendant was in Egypt.  On December 10, 2018, six days after returning to the United States, the defendant consigned the female sarcophagus lid, a mask with a beard, and another mask to Art Dealer-1 for auction and sale.   The artifacts sold at auction to Buyer-3: the sarcophagus lid sold for $3,750, the mask with beard sold for $1,500, and the large mask sold for $800.



The defendant also smuggled another uncharged artifact, namely, the terracotta Isis Aphrodite shown at left and marked Government Exhibit 208.  On November 5, 2019, the defendant returned to JFK from Cairo.  He made no customs declarations when he arrived in the United States.  The defendant subsequently consigned the artifact to Art Dealer-2, where it was sold for $2,000 to an unwitting buyer ("Buyer-4").

Furthermore, after consulting with an Egyptologist at the British Museum, agents determined that, prior to the defendant's arrest in 2020, the defendant had provided or

auction, through multiple prominent auction houses in New York, approximately **500** ancient Egyptian artifacts and that he started doing so in approximately December 2011.[1]

Those hundreds of ancient Egyptian artifacts were all placed for auction with "provenance" similarly (and fraudulently) purporting to reflect that they came from the same pre-1948 family collection of Egyptian antiquities (when removing antiquities from Egypt could have been permissible) that were in the defendant's possession when he was stopped at JFK Airport in January 2020 and which he had previously photocopied and used to pass off other ancient Egyptian artifacts for sale through the Art Dealers.  The provenance language, "private NYC collection, brought to the United States prior to 1948, to present owner by descent," mirrors the language used in the sale of the polychrome relief (Count 1), the limestone stele (Count 2), and the limestone head of a man (Count 3).  As the evidence established, the artifacts from Counts 1, 2, and 3 were not, in fact, in the United States prior to 1948, as the defendant smuggled them into the United States in 2019.  Any assertion by the defendant that these hundreds of other ancient Egyptian artifacts that he sold at auction were legitimately exported from Egypt prior to 1948 and were imported to the United States many years ago by an ancestor of the defendant, and which all came from some otherwise unseen and unknown extensive family collection of artifacts, is not credible.

The defendant attempts to minimize the extent of his criminal conduct by, for example, arguing that it did not constitute a "pattern" because there are supposedly not even *two* instances of his smuggling beyond the charged period.  Such statements belie the defendant's asserted acceptance of responsibility.  The defendant's minimization of responsibility, however, is consistent with his refusal, at the time of his change of plea, to execute a factual affidavit stating that all the artifacts he had sold using the same *modus operandi*, including the same fraudulent "provenance," are subject to seizure and repatriation to Egypt, the true owner of these pieces of cultural heritage.  It was, of course, the defendant's right to choose not to sign such a factual affidavit.  It also speaks to the level of his acceptance of responsibility—someone who had truly grappled with accepting responsibility would be remorseful of all his illicit conduct and help facilitate the return of these stolen Egyptian artifacts.  That is not this defendant.

---

[1] The timing of the defendant's prodigious, profitable smuggling scheme coincided with the turmoil in Egypt that followed the protests known as the "Arab Spring," during which time there was massive looting of the country's archaeological sites.  *See e.g.*, *"Space Archaeologists" Show Spike in Looting at Egypt's Ancient Sites*, Megan Gannon, Feb. 29, 2016, available at https://www.scientificamerican.com/article/space-archaeologists-show-spike-in-looting-at-egypt-s-ancient-sites/ (last accessed August 18, 2025) ("Looting levels at least doubled from 2009 to 2010, in connection with the global economic crisis, and then doubled again from 2011 to 2013, following the revolution that began in Egypt in January 2011.").

C. <u>The Defendant's Cellphone</u>

In addition to the evidence from the defendant's cell phone already discussed above—including the geotagged, dated photographs of ancient Egyptian artifacts that the defendant subsequently smuggled into and sold in the United States, and the Whatsapp chat with "Major Hassan" in Egypt—the phone also contained chats with yet other individuals who appeared to be in Egypt and who offered the defendant a variety of artifacts, sometimes freshly looted from the ground. Upon receiving images of the looters' inventory from Egypt, the defendant responded either by indicating his interest in a particular artifact, or declining it by marking an "x."

The defendant's phone also contained video clips from looters in Egypt, who sent the defendant videos displaying various artifacts, presumably for sale. One such video, taken at night, shows an individual at the top of a dig site with a ladder extending underground. The individual climbs down the ladder, stopping to highlight for the camera (*i.e.*, the defendant) several ancient carvings and reliefs *still intact* in the walls of the previously undisturbed site. At the bottom of the site are more reliefs, and a large pool of water, indicating that the site was freshly dredged to provide access to the artifacts underground. In another video, the camera scans in front of multiple reliefs, with the sounds of dripping water and an electrical generator in the background. The individual then presents a piece of paper, and pans upward, revealing the entrance/exit of the dig site. A third video showed a number of artifacts and a piece of paper with both a calendar (in eastern Arabic numerals) and the date (01/11/2019) written in ink on another piece of paper.

III. <u>The Guidelines Calculation</u>

The defendant's U.S. Sentencing Guidelines calculation is as follows:

|  | U.S.S.G. Section |  |
|---|---|---|
| Base Offense level | 2B1.5(a) | 8 |
| Value of Cultural Heritage property greater than $40,000 | 2B1.5(b)(1)(B); 2B1.1(b)(1)(D) | +6 |
| The cultural heritage resource constituted a funerary object and cultural property | 2B1.5(b)(3)(B) and (E) | +2 |
| The offense was committed for pecuniary gain and otherwise involved a commercial purpose | 2B1.5(b)(4) | +2 |
| The offense involved a pattern of misconduct involving cultural heritage resources | 2B1.5(b)(5) | +2 |

| Acceptance of responsibility | 3E1.1(a) | -2 |
| --- | --- | --- |
| Zero-point offender | 4C1.1(a) and (b) | -2 |
|  |  |  |
| Total Offense Level |  | 16 |

This is consistent with the Guidelines calculation in the PSR. PSR ¶¶ 31 to 42, and 89.

The defendant's criminal history category is I. Therefore, the corresponding advisory Guidelines range of imprisonment is 21 to 27 months' incarceration.

IV.    A Sentence Above the Guidelines Range Is Appropriate

   A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. United States v. Booker, 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

   B.    Application of 18 U.S.C. § 3553(a) Factors

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a sentence above the Guidelines range is appropriate for this defendant.

9

The defendant committed his crimes with both unabashed greed and a blatant disregard of the law.  He travelled repeatedly to Egypt to get ancient Egyptian artifacts for the purpose of smuggling them into the United States to sell through auction houses.  During the 14-month period from September 20, 2018, to January 22, 2020, the defendant took at least five roundtrip smuggling excursions from JFK Airport to Cairo, Egypt.  On *each* of those trips he smuggled artifacts into the United States—ancient cultural artifacts that belong to the Egyptian state.  And, each time he returned to the United States, he lied on his Customs declarations.

As part of his scheme, the defendant lied to the art dealers to whom he consigned the artifacts for auction and sale.  He concealed from the art dealers that he had recently smuggled the artifacts.  Each of the art dealers knew it would be unlawful to possess, let alone sell, Egyptian artifacts recently brought into the United States from Egypt without specific government documentation from Egypt.  The defendant, therefore, engaged in an elaborate and long-term subterfuge and fabricated provenances repeatedly indicating that the artifacts were from his grandfather's collection, which was allegedly brought into the United States many decades earlier and well-before the date that Egypt and the United States entered into bi-lateral cultural property agreements.  The defendant then showed bogus provenances to the Art Dealers—but did not allow them to keep the original provenance—as proof of their authenticity and his lawfulness.  But, it was all a lie.

Indeed, the defendant has been using those same or very similar fabricated provenances and re-using the same fake story that his grandfather's antiquities collection had been in the United States many decades earlier to smuggle and sell *hundreds* of ancient Egyptian artifacts since 2011 for tens of thousands of dollars.  The defendant has been using that same fake story and documentation for all the stolen artifacts.  The criminal conduct here is egregious.  The defendant profited off the looting of Egypt's cultural heritage, and he did so when he could have practiced medicine in Egypt.  Unlike many other defendants who appear before this Court, this defendant had a viable profession that he could practice—he was a trained, licensed Egyptian physician.

On January 22, 2020, the defendant was finally caught red-handed.  He had been trafficking Egyptian antiquities since 2011 and there is no evidence that he would have stopped short of getting caught in January 2020.  This defendant must be deterred.

A significant sentence, an above-Guidelines sentence, is needed here to adequately reflect the seriousness and duration of the defendant's criminal conduct, the complete lack of respect for the law—any law, whether Egyptian law, U.S. law, or international law, all of which the defendant breached in his greedy pursuit—and to deter this defendant as well as others who feed the global market for looted antiquities.  Sadly, trafficking in Egyptian antiquities is not unique to this defendant.  The sentence should send a message to others who choose to traffic in looted Egyptian antiquities so that they may also be deterred.  For all these reasons, the government respectfully submits that a term of imprisonment of at least 36 months is warranted in this case.

V.         Forfeiture, Restitution and a Fine

The government respectfully requests that the Court impose forfeiture as part of this defendant's sentence. On January 22, 2020, the government seized the 590 artifacts related to Count Four of the S-2 Indictment. Those 590 artifacts should be forfeited so the government may start the process of repatriating them to Egypt.

Regarding restitution, the artifacts related to Counts One, Two and Three of the S-2 Indictment were consigned to Art Dealer-2 and sold to certain unwary buyers. When the government seized the artifacts from the buyers, Art Dealer-2 reimbursed two and paid back the purchase price of the buyers regarding the artifacts in Counts One and Three.

Therefore, restitution in the amount of $1,000 should be ordered to the benefit of Buyer-2 who bought the Stele (Count Two). Additionally, restitution should be ordered to the benefit of Art Dealer-2 in the amount of $5010. Art Dealer-2 reimbursed the buyer of the Polychrome Relief (Count One) in the amount of $3,810; and reimbursed the buyer of the Limestone Head (Count Three) in the amount of $1,200.

A substantial fine is also necessary to ensure general and specific deterrence. During the course of this scheme, the defendant profited handsomely. The defendant opted for the quick, illegal dollar to jump further forward in the economic line without regard for those who followed the rules and obeyed the law. A substantial fine under the Guidelines, therefore, will not only dissuade the defendant from committing similar crimes in the future, it will also deter others who are tempted to follow in his path. The government respectfully submits that the Court should impose a fine of $10,000.

VI.        Conclusion

For the above-stated reasons, the defendant should be sentenced to a term of imprisonment above the applicable Guidelines, to a term of 36 months' incarceration, to appropriately reflect the seriousness of his crimes, his lack of respect for the law, and the need to deter the defendant and others like him.

    Respectfully submitted,

    JOSEPH NOCELLA JR.
    United States Attorney

By:   /s/William P. Campos
    Nomi Berenson
    William P. Campos
    Assistant U.S. Attorneys
    (718) 254-6308/6104

cc: Counsel of Record (By Email)